UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ANNETTE SHEAD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:14 CV 731 DDN |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Annette Shead for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. The parties have consented to the exercise of plenary authority by the undersigned Magistrate Judge under 28 U.S.C. § 636(c). For the reasons set forth below, plaintiff's claim is denied.

## I. BACKGROUND

Plaintiff Annette Shead, born November 7, 1962, applied for a period of disability and disability insurance benefits under Title II of the Social Security Act on June 29, 2011. (Tr. 85-93.) She alleged an onset date of disability of July 1, 2008, due to carpal tunnel syndrome (CTS) in her right and left hands. (Tr. 135-39.) Plaintiff's claim was initially denied on November 28, 2011, and she filed a Request for Hearing on December 12, 2011. (Tr. 40-41.) The hearing was held before an ALJ on January 9, 2013, and at the hearing plaintiff amended her alleged onset date to September 1, 2010. (Tr. 123.) On January 24, 2013, the ALJ found that plaintiff was not disabled. (Tr. 7-20.) Plaintiff

exhausted all of her administrative remedies after the Appeals Council denied her Request for Review on February 12, 2014. (Tr. 1-5.) Therefore, the decision of the ALJ became the final decision of the defendant Commissioner.

## II. MEDICAL HISTORY

### A. Medical Records

On June 15, 2008, plaintiff sought treatment at the St. Alexius Hospital Emergency Department for pain in her right bicep and forearm. Plaintiff told the medical staff the pain had started two weeks prior, and she also reported numbness in her right arm. The medical staff's impression was a right arm sprain, and plaintiff was discharged with a work release form. (Tr. 278-79.)

On July 1, 2008, plaintiff was seen at the Barnes-Jewish Hospital Emergency Department. She complained of a "stinging and funny feeling in [her] right hand and arm" which worsened at night. (Tr. 220.) She said the symptoms were getting worse, but denied having weakness in any of her extremities. She was given a wrist cock-up splint, and was prescribed acetaminophen and codeine for her pain. (Tr. 218-27.)

On July 2, 2008, plaintiff sought treatment at St. Alexius Hospital Emergency Department for pain in her right hand. Plaintiff complained that the pain she experienced was 10 out of 10 on a pain scale. She told the staff she had been diagnosed with CTS. The medical staff determined she had joint pain, but found no signs of swelling, deformity, bruising, or limited range of motion. The medical staff's impression was right arm CTS. Plaintiff was given a dose of Toradol for her pain, and a prescription for Xanax to help her sleep. (Tr. 288-94.)

On February 11, 2009, plaintiff went to St. Alexius Hospital Emergency Room for pain and swelling in her right hand. She described having occasional numbness in her thumb and first two fingers. The physician documentation from her visit states she appeared to be in obvious pain, had soft tissue swelling and tenderness, and had a positive Tinnel's sign, or a sensation of tingling in the distribution of the median nerve

over her hand. The medical staff evaluated plaintiff as having CTS, and she was prescribed naprosyn and Ultram for her pain. The staff recommended she wear her splint as much as possible and follow up with her doctor for a possible referral to a neurologist or neurosurgeon. (Tr. 300-06.)

On August 29, 2010, plaintiff went to St. Alexius Hospital Emergency Department for pain and swelling in her right hand. She described the pain as intermittent and aching, and she reported having some numbness in her fingertips. The medical staff opined that plaintiff was suffering from chronic hand pain. She was prescribed Motrin and Ultram for her pain. (Tr. 318-24.)

On June 16, 2011, plaintiff sought treatment at St. Alexius Hospital Emergency Department due to numbness in her right hand. She also reported having chronic pain and numbness in both hands. During her examination, medical staff determined she had 3/5 grip strength in both hands and was suffering from CTS in both hands. Plaintiff was instructed to take ibuprofen and wear splints as much as possible. She was given a work release which stated she would be able to return to work the next day. (Tr. 230-40.)

On November 9, 2011, at the request of the State, plaintiff was examined by Patrick A. Hogan, M.D., a neurologist. Dr. Hogan opined that plaintiff "may have CTS but has a number of functional findings which lead one to question whether she actually has true CTS." (Tr. 334-35.) Dr. Hogan advised that plaintiff be thoroughly examined for CTS. (Tr. 334.)

On November 25, 2011, Donna Muckerman-McCall, D.O., a non-examining medical consultant for the State, completed a Physical Residual Functional Capacity regarding plaintiff. After examining all the evidence in plaintiff's file, Dr. Muckerman-McCall opined that, in an eight-hour workday, plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, and stand or walk 6 hours. She also found that plaintiff had no pushing or pulling limitations aside from her lifting restrictions, but did have some limitations as to fingering and feeling due to her possible CTS. Dr. Muckerman-McCall

found plaintiff to be mostly credible, but stated that plaintiff's CTS could not be completely diagnosed without a nerve conduction study. (Tr. 341-46.)

On January 3, 2012, plaintiff went to Grace Hill Murphy-O'Fallon Health Center for bilateral arm pain, and was examined by Miranda Coole, M.D. During the examination, plaintiff stated she took six Aleve pills per day, and used a rigid brace daily. Plaintiff also stated she had recently obtained insurance, and explained she had been unable to properly address her pain in the past due to her lack of insurance. Dr. Coole noted that plaintiff had reduced grip strength and mild pain in both wrists. Dr. Coole assessed plaintiff as having CTS, and she requested plaintiff undergo nerve conduction studies for further evaluation. (Tr. 397-99.)

On July 21, 2012, plaintiff sought treatment at St. Alexius Hospital Emergency Department for pain in her left shoulder. Plaintiff indicated that she was unable to raise her left arm. An X-ray was taken of plaintiff's left shoulder, which revealed minimal degenerative changes in the shoulder and no fractures or dislocation. Plaintiff was informed that if her symptoms persisted, an MRI should be taken of her shoulder for further evaluation. (Tr. 359-68.)

On August 29, 2012, plaintiff again sought treatment at the St. Alexius Hospital Emergency Department due to pain in her left shoulder. She was given a dose of Toradol for her pain, and her left arm was placed in a soft splint. (Tr. 318-20.)

On October 10, 2012, plaintiff was seen by Dr. Coole at the Grace Hill Health Center for pain in both of her wrists. Plaintiff described the pain as radiating from her wrists to her hands, and reported waking up at night due to the pain. She reported to the medical staff that she had tried using braces but had been unable to work with them on. Plaintiff tested positive for Phalen's, or a tingling sensation in the distribution of the median nerve over the hand, in both of her hands, and she was assessed as likely having CTS. She was restarted on gabapentin and NSAIDs for pain and inflammation, was given a referral for further diagnostic testing, and was prescribed Tramadol for her pain. (Tr. 380-82.)

On November 15, 2012, plaintiff sought treatment at the St. Alexius Emergency Department due to pain in both of her hands. Plaintiff reported that ibuprofen was not helping her pain, she had trouble sleeping, and she was out of oxycodone. She was discharged with a refill on her narcotics medication. (Tr. 349-52.)

On November 27, 2012, plaintiff was seen by Dr. Coole at the Grace Hill Murphy Clinic for her CTS and a medication refill. Plaintiff reported she had stopped taking gabapentin because it did not work. Plaintiff rated her pain 10 out of 10 on a pain scale. She said her symptoms were aggravated by repetitive work and hand intensive activity. Plaintiff was assessed as having CTS and was given a referral to a neurologist. Her Tramadol and Celebrex pain medications were refilled, and she was taken off of gabapentin. (Tr. 429-32.)

### B. Employer Questionnaire

On December 26, 2012, Shireen Yalda, an administrative assistant for Staffing One, plaintiff's most recent employer, filled out a questionnaire regarding plaintiff's past performance as a food service worker. The questionnaire was sent to Staffing One by plaintiff's counsel. On the questionnaire, Ms. Yalda indicated that plaintiff had not had absence or tardy issues; had been able to adjust to changes without becoming stressed; had no physical limitations on her ability to work; had been able to stay on task without special supervision; and had not needed any special assistance or adaptations to do her job. (Tr. 215.)

### C. Plaintiff's Testimony at Administrative Law Judge Hearing

On January 9, 2013, plaintiff appeared with counsel before the Administrative Law Judge (ALJ) and testified as follows.

Plaintiff was 50 years old and weighed 147 pounds. She graduated high school and was certified to be a nurse's aide. She was unemployed, and was last employed as a server for the St. Louis Public Schools. She had worked part-time there from September

14, 2011, through May 24, 2012. She had typically worked four hours a day during the school week. She stated she did not think she could have done the job full-time due to her CTS. (Tr. 24-26.)

Plaintiff had experienced hand pain for approximately six years. She stated she had been unable to fill out her disability papers without assistance because she could not hold a pen for a long period of time. She had pain "around the clock," and sometimes would wake up in the middle of the night due to the pain. She could not do her household chores without having to take breaks every five minutes, and she had difficulty maintaining her hygiene, cooking meals that required using pots and pans, and putting on clothes. (Tr. 26-28.)

She wore her braces 24 hours a day, although she would occasionally take them off if they got wet and needed to dry. When she was asked by her attorney how much weight she could lift comfortably without aggravating her hands, she answered, "[u]p into five pounds." She explained that if she lifted an object that weighed more than five pounds she would automatically drop it. Her medications did not effectively alleviate her pain, and she explained the medicine took too long to "kick in." (Tr. 28-30.)

Plaintiff stated that doctors had discussed surgery options with her, but at the time she did not have insurance and could not pay for surgery. She went on Medicaid approximately a year and a half before the ALJ hearing. (Tr. 30.)

**D. Evidence Submitted to the Appeals Council after the ALJ Determination**

After the unfavorable ALJ determination, plaintiff submitted evidence to the Appeals Council demonstrating that she had received neurological testing and surgery beginning on April 26 through August 15, 2013. (Tr. 5, 459.)

On April 26, 2013, plaintiff was examined by Stanley Iyadurai, Ph.D., M.D., at St. Louis University ("SLU") Hospital. (Tr. 459.) She underwent nerve conduction tests and electromyography ("EMG") testing of her right wrist. Dr. Iyadurai concluded that the

study showed evidence of mild CTS in her wrist. Dr. Iyadurai recommended further clinical and imaging correlation of plaintiff's CTS. (Tr. 459-60.)

On May 28, 2013, Ghazala Hayat, M.D., performed nerve conduction tests on plaintiff's left wrist at SLU Hospital (Tr. 452-53.) Dr. Hayat found evidence of a left median sensory neuropathy, which she concluded "can be consistent with, but is not diagnostic of… [CTS]." (Tr. 453.) Dr. Hayat recommended further EMG testing to localize the site of the lesion, as well as further clinical correlation. (Id.)

On June 19, 2013, Scott Vissi, M.D., scheduled plaintiff for a carpal tunnel release ("CTR"), a surgical procedure designed to treat CTS. (Tr. 442-43.) On that same day, plaintiff underwent a CTR conducted by Bruce Kraemer, M.D., at SLU Hospital. (Tr. 446-47.)

On August 9, 2013, Rama Velamuri, M.D., examined plaintiff at SLU Hospital. Plaintiff reported her symptoms had improved after the CTR, and she no longer experienced pain or abnormal sensation in her right hand and wrist. (Tr. 436.) Dr. Velamuri's examination of her right hand revealed a full range of motion with no pain, numbness, or tingling. Plaintiff desired to have surgery on her left hand as well, and Dr. Velamuri agreed to schedule a CTR for her left hand. (Tr. 437.)

On August 15, 2013, Bruce Kraemer, M.D., conducted a CTR on plaintiff. The operation was conducted without any complications, and plaintiff was taken to recovery in a "satisfactory condition." (Tr. 439-40.)

### III. DECISION OF THE ALJ

On January 24, 2013, the ALJ issued a decision that plaintiff was not disabled. (Tr. 10-16.) At Step One of the prescribed regulatory decision-making scheme, the ALJ found that plaintiff had not engaged in substantial gainful activity since September 1, 2010, her amended alleged onset date of disability. At Step Two, the ALJ found that plaintiff had the severe impairment of CTS. (Tr. 12.) At Step Three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or was

medically equivalent to an impairment on the Commissioner's list of presumptively disabling impairments. (Tr. 14.)

At Step Four, the ALJ determined that plaintiff had a residual functional capacity (RFC) to perform the full range of light work as defined in 20 CFR 404.1567(b), including her past relevant work as a house keeper. The ALJ noted that the position of housekeeper, as performed in the national economy, is an unskilled job performed at the light exertional level. The ALJ concluded that plaintiff had not been under a disability, as defined in the Social Security Act, from July 1, 2008 through the date of the decision. (Tr. 15-16.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see

also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.

Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to her PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

In this case, the ALJ determined plaintiff could perform her PRW as a housekeeper. Therefore, Step Five was not applied.

## V. DISCUSSION

Plaintiff argues: (1) the ALJ failed to perform a sufficient credibility analysis, and (2) the ALJ failed to provide sufficient limitations for her CTS.

Before addressing the arguments raised by plaintiff, it is important to determine the significance of the medical records that were submitted to the Appeals Council after the ALJ had already reached a final determination. Because the ALJ did not have an opportunity to consider those records when he made his decision, there is disagreement among the parties as to whether this court should consider the new evidence when evaluating the ALJ's decision. (Compare Pl.'s Br. at 13 with Def.'s Br. at 9-10.)

In Kitts v. Apfel, the Eighth Circuit held "[w]hen the Appeals Council has considered new and material evidence and declined review, we must decide whether the

ALJ's decision is supported by substantial evidence in the whole record, including the new evidence." 204 F.3d 785, 786 (8th Cir. 2000). This means the court "must speculate to some extent on how the [ALJ] would have weighed the newly submitted reports if they had been available for the original hearing," which has been noted to be a "peculiar task for a reviewing court." Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994).

In the present case, the Appeals Council acknowledged that it had received the additional evidence and made it part of the record. (Tr. 5.) Therefore, the court will determine whether the ALJ's decision was supported by substantial evidence in the record, including the evidence submitted to the Appeals Council.

**A. Credibility Analysis**

Plaintiff argues that the ALJ failed to perform a sufficient credibility analysis. Specifically, plaintiff finds fault with the ALJ's consideration of her infrequent treatment history and her ability to perform certain daily activities, including part-time work. (Pl.'s Br. at 13-15.)

A plaintiff's credibility is "primarily for the ALJ to decide, not the courts." Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003). The ALJ must seriously consider a claimant's subjective complaints of pain, and must give good reason for discrediting a claimant's testimony. Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990). When analyzing the credibility of a claimant's subjective complaints, the ALJ is to consider all of the evidence presented relating to subjective complaints. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Specifically, the ALJ examines the claimant's prior work record; observations made by third parties and treating and examining physicians; the claimant's daily activities; precipitating and aggravating factors; functional restrictions; the dosage, side effects, and effectiveness of medication; and the duration, frequency, and intensity of the pain. Id.

### i. Treatment History

When examining plaintiff's credibility in this case, the ALJ found significant "the relative infrequency" with which plaintiff sought treatment for her CTS. (Tr. 15). The ALJ stated that a failure to seek treatment during a claimed period of disability tended to suggest that plaintiff's symptomatology was either non-existent or tolerable. (Id.) Plaintiff testified at the ALJ hearing that she had received Medicaid coverage "about a year and a half" before the hearing, and prior to that she was uninsured. (Tr. 30.) Plaintiff argues that the ALJ should not have made inferences about her failure to pursue treatment without first considering the fact that she had been uninsured during much of the time she claimed disability. (Pl.'s Br. at 14.)

The Commissioner agrees that economic justifications for a claimant's lack of treatment can be relevant to a disability determination. However, the Commissioner argues that plaintiff failed to provide evidence that she was ever denied access to treatment due to her inability to pay. The Commissioner also asserts that plaintiff's treatment remained conservative even after she had Medicaid coverage. (Def's Br. at 6.)

While it is not clear whether plaintiff was unable to receive specialist care for her CTS while she was uninsured, there is still a significant gap in her treatment history even after she was covered by Medicaid. Plaintiff's testimony at the ALJ hearing indicates that she was covered beginning in July of 2011. (Tr. 30.) From January 4 through October 9, 2012, there is no record of plaintiff seeking any treatment regarding her CTS,[1] even though she had already received Medicaid coverage and been referred to a neurologist during her January 3, 2012 appointment. (Tr. 399.) Plaintiff was also referred to neurologists at least two other times after January 3, 2012, (Tr. 384, 431), but she did not follow up on the referrals for over a year after her initial referral. (Tr. 459.) Although plaintiff testified at the ALJ hearing that she underwent a nerve conduction study prior to the hearing, (Tr. 30), there is no medical evidence in record to support this. The first medical record of plaintiff undergoing a nerve conduction study is from April 26, 2013.

---

[1] During that time period she did seek treatment for other unrelated health problems.

(Tr. 459.) As the ALJ noted, this failure to seek treatment indicates either a tolerant or non-existent symptomology. (Tr. 15.)

Therefore, the ALJ was not in error when he weighed plaintiff's treatment history against her credibility.

### ii.     Daily Activities

Plaintiff also argues that the ALJ improperly weighed evidence of her daily activities. In his decision, the ALJ stated that "while not entirely dispositive, the claimant's ability to [prepare simple meals, shop in stores, and work part-time four days a week] does tend to indicate a residual capacity at odds with a finding for disability." (Tr. 15.) The ALJ did not find plaintiff's daily activities wholly dispositive on the issue of her credibility; he found only that her activities tended to weigh against a finding of disability.

Under Polaski, the ALJ is to consider a claimant's daily activities when assessing her credibility. Polaski, 739 F.2d at 1322. In plaintiff's testimony before the ALJ, she stated that if she lifted an object that weighed more than five pounds, she "would automatically drop it." (Tr. 29.) The fact she could shop, cook simple meals, and work a part-time job handing food to school children tends to discredit her testimony.

The ALJ's finding as to plaintiff's daily activities is also supported by the Employer Questionnaire which plaintiff's most recent employer had filled out. The responses by plaintiff's employer on the questionnaire did not indicate that plaintiff's CTS had interfered with her ability to perform her on-the-job duties. Instead, the questionnaire demonstrated that plaintiff had been a competent and punctual employee. (Tr. 215.)

Therefore, the ALJ performed a sufficient credibility analysis, and his decision to partially discredit plaintiff's testimony is supported by substantial evidence in the record.

**B. RFC Limitations**

The ALJ found that plaintiff had the RFC to perform the full range of light work as defined in 20 CFR 404.1567(b), and found she was capable of performing her past relevant work as a housekeeper. (Tr. 14.) Plaintiff argues that the ALJ failed to properly link his discussion of the record to the RFC determination, and failed to provide sufficient limitations for her CTS. (Pl.'s Br. at 10-13.)

Specifically, plaintiff argues this case requires a remand because the ALJ did not state whether plaintiff's CTS was severe in both hands or only in one hand, and did not discuss the degree to which she could finger, feel, hand, or grasp objects. Plaintiff cites St. Clair v. Colvin, a case from the Western District of Missouri, in which the court remanded after the ALJ found that the claimant suffered from severe CTS, but did not discuss whether her condition was unilateral or bilateral, and did not discuss the degree to which the claimant could "reach, handle, finger, or feel objects." No. 2:12–04250–DGK–SSA, 2013 WL 4400832, at *2 (W.D. Mo. Aug. 14, 2013).

In present case, the ALJ discussed the bilateral nature of plaintiff's CTS several times. (Tr. 13-15.) However, the ALJ did not explicitly discuss limitations in regards to plaintiff's ability to reach, handle, finger, or feel objects.

The Commissioner argues that the absence of such limitations in the ALJ's RFC determination indicates that he found no limitations in that area. The Commissioner cites the Eighth Circuit case Depover v. Barnhart to support her argument. 349 F.3d 563 (8th Cir. 2011). In Depover, the ALJ had not assessed the claimant's abilities on a function-by-function basis. However, the reviewing court found the "functions that the ALJ specifically addressed in the RFC were those in which he found a limitation, thus giving us some reason to believe that those functions that he omitted were those that were not limited." Id. at 567. The court concluded that the ALJ had implicitly addressed the functions which were not specifically addressed in the RFC.

The Commissioner also cites the Eighth Circuit case McCoy v. Astrue, in which the claimant argued that the ALJ had erred by failing to make explicit findings regarding

- 13 -

his ability to stoop, stand, walk, hand, and reach. 648 F.3d 605, 615 (8th Cir. 2011). The court held, "[w]e review the record to ensure that an ALJ does not disregard evidence or ignore potential limitations, but we do not require an ALJ to mechanically list and reject every possible limitation." Id. The court found that the ALJ implicitly made clear which of the claimant's limitations she found credible by including them in the hypothetical she gave to the Vocational Expert during the ALJ hearing. The court held that because there was an implicit finding of the claimant's limitations, there was no reason to remand in order to make the finding explicit. Id.

In the present case, the ALJ made an implicit finding of the claimant's limitations regarding her ability to reach, handle, finger, or feel objects. The ALJ recognized plaintiff's complaints of numbness, tingling, and reduced grip strength in her hands, but found that the alleged limitations caused by these symptoms were not supported by the medical record. (Tr. 13-15.) The ALJ also addressed the findings of the non-examining state agency physician, Dr. Muckerman-McCall, who found plaintiff had no limitations regarding her ability to reach and handle objects, but did have limitations with fingering and feeling. (Tr. 343.) The ALJ found that the level of limitation advanced by the doctor was "slightly in excess of the objective record," and explained that more recent records had shown no significant limitations. (Tr. 15-16.)

Plaintiff argues that the ALJ improperly weighed Dr. Muckerman-McCall's evaluation. The Eighth Circuit has held that "the opinion of a nonexamining consulting physician is afforded less weight if the consulting physician did not have access to relevant medical records, including relevant medical records made after the date of evaluation." McCoy, 648 F.3d at 616. In this case, Dr. Muckerman-McCall was a non-examining consulting physician and she did not have access to relevant medical records made after the date of plaintiff's evaluation, including a medical record which indicated plaintiff did not have significant pain or movement problems with her fingers or hands. (Tr. 350.) Therefore, the ALJ did not give improper weight to Dr. Muckerman-McCall's

evaluation when he determined that the level of limitation she advanced was in excess of the objective medical record.

Because the ALJ made an implicit finding as to the plaintiff's ability to finger, feel, handle, and reach objects, there is no legal requirement to remand to make the findings explicit. The ALJ's RFC determination is supported by substantial evidence in the record.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the defendant Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.


      /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on November 24, 2014.